Before we start the clock, all right, I notice more than one council at the tables and so I just want to make sure you are Mr. Wesley, correct? Yes, Your Honor. Will you be using the full 20 minutes or will you be sharing time? I will be using the full. You don't have to. I might not. I reserve the right to use the full. I'm not having that feeling. So, and then now I see two listed on the other side, Christine LaPera and Andrew Bart, correct? Yes. So you'll be dividing your time? No, actually, we've agreed on doing the primary argument and Mr. Clark is reserving the resources if needed, but may not be wanted. Okay, well, let me just ask a question on that. So, how will we know if he's going to take three minutes? I will stop at 17. Okay. I beg your honor, I think it would be conclusion. Well, they always have rebuttal, too. That's fine. Okay. All right. So, just so that sometimes, the reason I like to know this is because sometimes when people agree to share time, the person that gets up first just keeps going and going and I can see the other person sitting there not knowing whether to leap and tackle them or do whatever. And so, I like to be a little bit in charge on that so that the person gets their time and then I tell the other person. So, I'll kind of monitor that a bit. All right. So, I think we're ready to start. So, Mr. Wesley, if you state your name and your appearance and if you want to reserve any time. Thank you, your honor. And may it please the court, Keith Wesley for the plaintiff and appellant. I'm joined by my partner, Eric George. And with the court's permission, I'd like to reserve five minutes for rebuttal. All right. We'll see how that goes. Okay. Thank you. This appeal is both exceedingly complex and exceedingly simple. The cast of characters, the procedural history are complex. But the legal issues this court must decide are not. They're really quite simple. Both the United States and the country of Egypt give authors alone the right to make fundamental changes to their copyrighted works. In the United States, this right is called the right to make derivative works. It's protected under 17 U.S.C. 1062. In Egypt, this right is called the right to prevent any modification considered by the author as distortion or mutilation of the work. It's protected under Article 143 of the 2002 Egyptian Act. So in this case, through Article 143, the Hamdi family retained the right to prevent any fundamental modification to the work Kosara. Well, it seems to me that if the only rights retained after the multiple agreements are quote-unquote moral rights, which in Egypt allow for injunctive type relief, why does the plaintiff have standing to sue for money damages? Well, Your Honor, we're not suing under Egyptian law. And the framework that the courts have set up in the seminal cases, Itartas, I-T-A-R hyphen T-A-S-S. That's a Second Circuit decision, 1998. They say that you look to the law of the country of origin for determining ownership issues. And that makes sense because that's where the work was created. But then when you look at infringement, you look at the law of the country where the infringement occurred. And that's right here in the United States. And so we're not suing for injunctive relief under Egyptian law. We are suing for a violation of the United States Copyright Act. Well, I guess I'm thinking the plaintiff appears to equate an author's moral right under Egyptian law of being able to prevent someone from distorting the author's work with the right under the U.S. Copyright Act to sue for money damages where someone exploits copyrighted material through a derivative work. Is that a fair statement of the plaintiff's case? Well, I think that generally that is fair. That when you put aside the labels, when you put aside whether it's a moral right or an economic right or a copyright, if we're just talking about what this right is, it's the right to make changes in a work. Well, are those two rights the same as I defined them? One being the moral right to prevent someone from distorting the author's work to the copyright, U.S. Copyright Act, to sue for money damage where someone exploits copyrighted material through a derivative work. Are they the same rights? I think they are. And the basis for my conclusion is set forth on pages 34 and 35 of our opening brief. But then wasn't there some expert testimony that said adaptation as used in the 2002 Egyptian Copyright Law is the same thing as derivative work under U.S. Copyright Act? So isn't the economic right of adaptation transferable under Egyptian law? Well, it is transferable, but it's subject to a restriction. In other words, in copyright cases, we have what's often times called a bundle of rights. And you can slice up that bundle as leanly as possible or as broadly as possible. And so one person can own the right to make changes to a work, but somebody else may own a subpart of that right, the right to approve any fundamental modification. Because there's a difference, Your Honor, between simply adapting a work and making a fundamental change. For example, we're dealing with a music composition. If somebody just sang that song verbatim, that would technically be a derivative work. But there's been no change. There's been no fundamental modification. But it's something totally different to make a change that's as fundamental as what we have here. And I just want to highlight for Judge Callahan, in case I'm not sure if I got this out. Okay. I think I interrupted you, so go ahead. No, no, no. My apologies. Page 35 is where we detail several authorities saying directly that what some countries call a, quote-unquote, moral right. This is in your brief, right? Yes, opening brief, page 35. I'll just quote from... Well, a moral right is not the same as an economic right. And either a moral right is enforced or it's not enforced in the United States. It could be enforced in Egypt. Well, I disagree. I think those terms are too broad. I think that the way the law has developed, we have hundreds of countries out there that have different rights. Some call them moral rights. Some call them economic rights. And I think if we use those labels, we're oversimplifying matters. I think what is occurring here is that we have a copyrighted work in Egypt and somebody in America makes a fundamental change to that work. Well, he bought it, if you will. He paid money for it. Now, the question I've got is whether or not the moral right survives crossing over to the United States as opposed to the economic right, which I think your experts, all the experts agreed, is a big part of that bundle of rights. Well, let me take a step back, if you don't mind, Judge Kelly. No, not at all. Because I want to be clear about what we're doing here. In every copyright case, the first thing you look at is ownership. Okay? So for purposes of ownership, because it was an Egyptian work, we go back to Egyptian law. And under Egyptian law, nobody, if you're an author or his heirs, can give away the right to make fundamental changes. They can try. They can put it in a contract. Well, the question is, is that enforceable in the United States? And that's the rub, isn't it, Judge Kelly? Why rub? I just don't know what the answer is right now. I think the answer is that the derivative work right in the United States, if you look at the cases we cited explaining what a derivative work is, it's exactly the same thing as the right to make fundamental changes. We've cited cases in our brief even saying that the right to, or the use of a musical composition in a sample is an example of a derivative work. So we need to sweep aside these broad labels like moral rights, economic rights. And I think, frankly, that's where the district court got led astray. Because really what the district court held is that the same right, the right to make fundamental changes, could be both a transferable economic right in Egypt and a non-transferable moral right. That's like saying you can transfer your car if you call it a car, but if you call it an automobile, you just can't transfer it. It's not about labels. It's about what right can be transferred. And under Egyptian law, it's clear that the right to make fundamental changes, regardless of contract, stays with the author and his heirs. And so then we move on to Judge Kelly's question, can you enforce it in the United States? And that's where you get to the derivative works provision. I have a question just before you go completely into that. The appellee's brief states that plaintiff's own expert testified that the plain language of the 2002 agreement allows the defendants to use Yusei Kosara in Big Pimpin, and it's in the red at 33 to 34. How do you explain that testimony? You're going to have to give me a moment, Your Honor. I have to find our response. If you want to go on to the other area, when you sit down, you can tell me on rebuttal if that would be better for you. That makes sense. I'm going to put a pin in that. I'll get back to you. I have it in red at 33 to 34. One case that I wanted the courts to look at, the court to look at, that we probably didn't give enough attention to in our brief, frankly, is the Itar-Tas case that I mentioned earlier. That's at 153, F3D, 82, Second Circuit, 1998. And in that case, the defendant, Currier, was a Russian language weekly in New York City. The plaintiffs published daily papers in Russia, and the defendant copied articles directly from those Russian papers and then distributed them in the United States. So you have a New York-based Russian publication, a Russian-based publication, and the Russian-based publication sues the New York-based publication solely for infringement in the United States. So it's kind of analogous to what's going on here. We have an Egyptian copyright owner, defendants in the United States exploiting the Egyptians' work right here in the United States. And there are several key lessons, I think, that are right on point in this case. Number one, issue of ownership of copyright is determined under the law of origin. There, Russia, here, Egypt. Number two, the foreign law of ownership applies even if contrary to U.S. law. There, specific Russian provisions regarding whether reporters or newspapers own rights and articles. Here, the inalienable right to approve fundamental changes. Three, and I think this is the most important point, the court of appeals does not defer to the district court's determination of foreign law. In other words, the court of appeals said we know the district court heard the testimony firsthand but we don't have to defer. Issues of foreign law are not about the credibility of the experts, it's about the logic of their analyses. And there, the district or the court of appeals reversed the district court's interpretation of Russian law because it found it not as persuasive. What do we do with cases like Garcia? That just says that moral law is not enforceable in the United States. Or with Chaffins, I don't know if I'm pronouncing that correctly, that Congress expressly legislated moral rights would not be granted to foreign authors under the convention that they were speaking of. Your Honor, Garcia was dicta in my view. It was not necessary to the holding and it was just a broad proclamation. It wasn't talking about this Egyptian provision. Well, I know it wasn't this provision. I don't think we should fault the Egyptians for labeling something as a moral right. Moral right doesn't mean we're legislating morality. It means it's a fundamental right. It means the authors are placed above everyone else in that scheme. Then what do they sell when they sell the economic rights? According to our expert, and I think the only way you can harmonize the two provisions is they sold the right to make derivative works but at any time the person who now owns the right to make derivative works wants to exploit it, it has to go back and get approval from the author. In other words, the author still owns the right to make fundamental changes. How do you ever do a deal and just pay for something and then you get yours? What you're proposing sounds like someone always can claw back and get more money. It's not that difficult. We cited the Jay-Z's publishing deal. Same thing. He granted the rights to his publishing company to exploit his works, but he reserved the right to make fundamental changes. We just did it by law at the time and place of the contract. According to the US Supreme Court precedent, if the law at the time and place of the contract says X, then X is written into the contract just like it's an express provision. I only have five minutes on this stage. I wanted to just note one thing, which is we've been assuming here that there was a clear express transfer of the right to make derivative works to Mr. Jaber in 2002. That's been just an assumption we've been making. But I want to remind the Court that that was a determination as a matter of law. Well, you got kicked out on standing. So if we didn't agree with that, then I'm assuming it would have to go back to resolve the judgment as a matter of law, right? Correct. Because that wasn't resolved. Correct. That's right. And there was a jury, right? There was a jury. And before the jury was able to reach a verdict, judgment as a matter of law was granted against us. And as the Court knows, judgment as a matter of law means that the Court has to disregard all of their evidence that's reasonable and accept all of ours is true. And if you look at the agreement, the actual transfer, I don't think any of us can read it. It's at 998 through 1,000 of the excerpts. I don't think any of us can read that and say, this is crystal clear. When I read that agreement, I know for a fact that this man, Osama Fahmy, was transferring the right to make fundamental changes to the work. If you want to sit down, I'll give you five minutes. And you only really have three. Oh. Well, I appreciate that, Judge Gallagher. Okay, so if you sit down now, then you've got five. You saved me. I appreciate that. But, I mean, if the Court continues to have questions, I'll make sure that all of your questions are answered. Thank you. Because, obviously, that's the whole point here. Good morning. Good morning. May it please the Court. My name is Christine LaPera. I'm a member of Mitchell, Silberberg, and Knapp. I'm arguing on behalf of the Appellees and Defense, subject to the reservation which we discussed earlier. Mr. Bart also appears for Mr. Carter. Let me address the issues in perhaps a different order. But I think the most important thing here is the Court's initial reaction is that plaintiff is seeking to import moral rights into this country. There are terms. And there are terms for a reason. Plaintiff is trying to muddy and collapse, conflate 106.2 under the U.S. Copyright Act as a derivative work right with immoral rights. That's recognized in various countries. In addition to Garcia, when Court would look back at the Berne Convention and the Berne Implementation Act of 1988, there was a huge brouhaha, for lack of a better word, over whether or not the Berne Convention's section on moral rights would be read into or potentially read into the Copyright Act. And it was expressly discussed in legislative history and in much commentary, including in Nimmer, that it would not be. There would be no expansion of the rights under the U.S. Copyright Act. The only time moral rights has ever been statutorily allowed in this country. And it is a statutory issue. It's an issue of public policy. It's an issue of foreign policy. It's an issue of legislation versus judiciary rights. Sovereignty, extraterritoriality. The only time it's been allowed in under federal law is for VARA, which is a visual arts provision specifically statutorily enacted under the U.S. Copyright Act. So in that framework, when we're talking about whether they're different, they are night and day. And here's the answer, I think, to... the question of what rights were conveyed by the 2002 agreement, not a fact question that should have been decided by the jury. Yes, because the expert for the plaintiff and the expert for the defendant agreed that the only question was whether or not under the 2002 transfer agreement, foreign law said X or Y. There was no ambiguity other than the question of foreign law, which is for the court. There was no extrinsic evidence on transferability. The only question is whether under that agreement anything had been preserved to Mr. Fahmy through his uncle that would allow him to come and sue for damages. And one of the things I would really like to read to the court before I forget, if I may... If they had put that in the contract itself, would it make a difference? Absolutely. And I think the reference to Mr. Carter's contract is, again, misleading, because Mr. Carter, first of all, is a 50% copyright owner of an economic right, which is different than a moral right. That's a non-economic right, and I'll explain that in a minute. He also put a specific contractual provision for approval of changes. There is nothing in the Egyptian law whatsoever that allows Mr. Fahmy to go in and seek approval of a derivative rights transfer. So he transferred the right of adaptation, which the court has correctly noted is the same as an economic right, a derivative right, because it's about money. It's an economic right. It's a property right. It's an intellectual property right that can be exploited. The only thing a moral rights holder can do in Egypt, where it's recognized, where it's not recognized here at all, is go in, object to the creation by that economic rights holder of a derivative work that they believe violates their personal moral right of integrity. They cannot get money damages. They can only get an injunction, but here's the real rub. Here's what I'd say nails the coffin on this one, with all due respect. There's Article 144 in the Egyptian law, which, by the way, they say is incorporated fully into the contract. Under Egyptian law, in order to obtain an injunction through an exercise of the owner's moral rights for a purported distortion or mutilation of a work, the objecting owner must, quote, within a delay fixed by the court, pay... within a delay fixed by the court, pay in advance a fair compensation to the person authorized to exercise the economic rights of exploitation, otherwise the court order of injunction is void. So what that says is, of course, if you pay someone for something, they have a right to exploit it because they're looking for the monetary rights. The agreement itself is clear and unambiguous. There's no extrinsic evidence. It's strictly a question of foreign law here, which Judge Snyder correctly interpreted hearing the two Egyptian experts, both who agreed the transfer was unambiguous, both who agreed there was no extrinsic evidence, both who agreed that an adaptation was part of the economic rights under Egyptian law that can be transferred, both of whom agreed that the question for interpretation was whether or not Egyptian law essentially should be carried over into the United States to allow a moral rights owner in Egypt who has no right of economic exploitation to sue for damages here. Well, I asked appellant's counsel, and he's going to deal with this in rebuttal, so you might... It was in your brief on 33 to 34 that you said that the plaintiff's own expert testified that the plain language of the 2002 agreement allows the defendants to use Kisara in big pimping. Yes. And there's a lot of other admissions by Mr. Lutfi. He said the agreement was clear and unambiguous. He said that all of the financial rights were transferred. His point, and the point that Mr. Wesley is trying to make, is notwithstanding that, that Mr. Fahmy gets to under 143, come and say to Mr. Jobber or any of his allies excuse me, you need to stop, and I'm going... If you do something worldwide, I'm going to be able to sue under all these other U.S. or other countries' laws for money damages. Well, he doesn't even have that right in Egypt. So if, in fact, he can go into Egypt with a moral rights claim, which is a personal integrity claim, not an economic property right, and only get an injunction if he pays the economic rights owner, how could he come into the U.S. under 1062 and claim that he's a derivative rights owner, which is an economic right, and get money damages? He wants to basically get a better deal here than he would get in Egypt. He wants to not only get a better deal here, he wants to collapse foreign policy and mislead by suggesting a derivative right and an economic right is the same as a moral right. They're expert agreed. They're separate. They're independent. In the statute, they're separate and independent. They've agreed adaptation is an economic right that is a financial usage right that is transferable under Egyptian law. They have agreed that an adaptation right is the same as a derivative right. Moral rights is under 143, and moral rights is not a financial usage right under Egyptian law. It is a moral right very similar to what France has, to what other countries have, who have agreed to not only have an economic right under copyright. Appellant got kicked out on standing, right? Right. Because the court said you got rid of everything. That's right. What else did the court do? Explain to me exactly where we were in the proceedings so I understand that I have it correctly. Absolutely. We've approached this with the court on multiple occasions, but the court wanted to hear the Egyptian experts. So at the trial, which was a full trial, only on liability, it was bifurcated for damages. You never got to the damages. Correct. But it was a jury, right? Correct. At the conclusion of the jury trial, which took in evidence on all the other issues, in addition to element one of the U.S. Copyright Act, which is ownership, right, at the conclusion of that jury trial, there was no extrinsic evidence presented of any intent or meaning, subjective or otherwise, with respect to this 2002 agreement. If you read the 2002 agreement, which I suggest that you do, and I think the site was already given to you, the word all appears six times. The word all rights, financial usage rights, under the Egyptian Copyright Act were transferred to Jaber. Solely appears three times, solely to him. This is a final quittance. There are words in there that have such clear, plain meaning, most particularly the word all, which was also looked at in the Norfolk case, by the way, in a different context, statutory interpretation. What does the word all mean? All means all. It's unambiguous, and it's only financial rights. It says nothing about maintaining any restriction on that right. It says nothing on any limitation. The moral rights under 143 and 144, which, as I said, do not give a right to money. In fact, he would have to pay Jaber back if he tried to stop anything in Egypt. The jury didn't say they had no standing. The judge did. The judge did, because it's a question of foreign law, and there's no question under Federal Rule of Civil Procedure 44.1. So we had finished the evidence in the first part of the trial. Did the jury decide anything? No. What we did is we made a Rule 50 motion, which was granted by the court on the grounds that element one of a 162 claim, a derivative right infringement claim, was not met, because under Egyptian law, under the unambiguous terms of his transfer agreement in 2002, he had no derivative right to sue at all, and the moral rights that he was trying to impress and collapse with the derivative right could not be enforced in the United States. He essentially, when Mr. Ross got up into the opening and said, they failed to respect Mr. Hamdi, Mr. Fahmy's moral rights. That's all. It was a foreign law question. Is there any question of fact in respect to the transfer? There was not. It was strictly a question of Egyptian law. Once the court heard the Egyptian experts on these issues, it could clearly look at the Egyptian law itself. It didn't even need the experts, nor does this court. And just look at the Egyptian law. And when you look at the Egyptian law and you look at the 2002 transfer agreement, Mr. Fahmy has no right to sue or claim any right as a derivative rights owner under U.S. copyright law. And that is the most important part. But, you know, I think labels are very important here, because, again, we're talking about... And one of the cases that plaintiff cites that I believe is, you know, important to reference is plaintiff actually says that the Berne Convention supports this analysis by plaintiff. He's got it backwards. He's suggesting that by the national treatment doctrine under the Berne Convention, we're supposed to allow foreign nationals to come in and give them superior rights to the American nationals. That's so that if we go into Egypt or wherever we go as American nationals, we're supposed to get the benefit of American law. That's not how the law works. And the Ninth Circuit has already said in Creative Tech versus Aztec, 61, F3, 696, Ninth Circuit, 1995, the principle of national treatment implicates a rule of territoriality in which the applicable law is the copyright law of the state in which the infringement occurred, not that of the state of which the author is a national or in which the work was first published. Well, let me ask you this. If you assume the plaintiff conveyed all of the economic rights of exploiting Kassara but retained the moral right to prevent distortions, why doesn't he have standing to sue for injunctive relief only? Because that's an Egyptian law that provides the moral rights. You don't have a remedy for moral rights injunction here either. So you don't have a right to sue for an injunction based on a moral right. You only have that right in Egypt or France or territorially wherever the moral rights reservation is contained. In other words, the point of the transfer allows him in Egypt, and you read only the Egyptian law as it is, in whole, it allows him to go into Egypt. Well, but you're apparently conceding that he could have a moral right. Under Egyptian law, yes. Under Egyptian law. So if he could theoretically sue the defendants in Egypt, wouldn't he likely face a personal jurisdiction problem there? Again, maybe. But the other thing is he actually has to go to Jobber first, which he's never tried, pay Jobber for the right to an injunction and pay money back for the transfer. And that's never been attempted. So that's step one. Point being, is under 1062, which is what he's suing over, a derivative rights owner, an owner of a derivative right in the United States is not an owner of a moral rights claim in another country. So the injunctive relief that's available under 1062 is only available to an owner of the intellectual property right, not someone who has solely maintained a moral right in the country of origin. Could he have written, in your view, an agreement that would have allowed him to sue for what he's suing here? Absolutely, Your Honor. What would that have had to say to integrate from, I'm asking from your viewpoint, what would that have had to have said in order to allow for that? First, he could say, I'm not selling you the adaptation right as one of the financial rights. I'm excluding that. He could say that. He didn't do that. He included it as part of all, because it's clearly one of the non-exhaustive under Egyptian law rights of an economic rights holder. It's the right to create a derivative work that's analogous to adaptation. He also could have said, more limitedly, he could have said, okay, I'm going to give you the adaptation right, but you must come to me first before you try to license it or sell it, and I'm going to actually approve the creation. Doesn't say that either. None of the statutes that Mr. Wesley can point to provide for either of those things to a moral rights owner. All they provide is if they see something they don't like, they have to say, I don't like it, take it out of circulation, I want an injunction, but I'm giving you all your money back because I know I paid you for the economic rights. Are you maintaining that the right of adaptation includes what Mr. Wesley talks about as the fundamental right to change? It is not a fundamental right of a moral right character, and that's where he's trying to collapse. There's two rights to make changes. Well, if you're right, then by transferring the right of adaptation, he didn't transfer the moral right. He didn't transfer the moral right, no, of course not. You're just saying he can't enforce the moral right here, he can go to Egypt to enforce it. Exactly. No, you can't transfer the personal right of integrity under Egyptian law, and the remedies under Egyptian law, not U.S. law, we don't recognize it for any purpose. So if he got a judgment in Egypt, couldn't he bring that judgment and enforce it here in California? A judgment for an injunction? Yeah. Well, first he'd have to go through the two steps. He'd have to go through taking his 2002 partner, who gave him whatever it was, 115,000 pounds in a final acquittance, he could take that, he could say, Mr. Jobber, I'm paying you back your money, okay? He wouldn't have to pay the whole thing. Whatever's a fair and reasonable compensation, exactly. Doing the adaptation. Correct, and get an injunction in Egypt, over the Egyptian exploitation in Egypt. Problem with that is, this is not exploited in Egypt. You mean the song hasn't been played in Egypt? Okay. Okay, I'm going to stop the clock for a sec. Did you have a question? Okay, I'm going to stop the clock for a sec. Yes. All right. Are you going to want three minutes? No. No, I didn't mean to convey anything by my face here. I just want to make sure. Okay. I'm disappointed. Okay, keep going. Okay, so, again, I just think it's very important, because the agreement itself and the issues with respect to, which Mr. Lutfi, the expert for plaintiffs, said was clear and unambiguous, meaning it should be strictly an issue of foreign law as to whether or not that agreement, and this is what he was talking about in ITAR. Yeah, you can decide under foreign law the ownership question, but you can't decide under foreign law the rights and remedies of another country. You cannot do that, and if you have a separate right, you cannot morph that and import it into another country. So when you look at the financial agreement that was made, which is exactly what the court did, interpreted under foreign law, it was not ambiguous from any kind of external evidence other than the Egyptian expert testimony as to what the foreign law was. It says, in very important points, Jobber or his successors are solely the owners of the financial usage rights stated in the Egyptian law, 82 for the year 2000. Jobber and his successor become the sole publisher of the melodies of these songs in all the current publishing means, and in any way he deems it was direct or indirect. The use includes all the usage means and methods available. It goes on, and as I said, if you read the agreement at the record site, you'll see the word all is cited in there with no reservation six times. There's, you know, uses such as whatever means is available, and the only way that the plaintiff is able to collapse all of this into claiming that under 106.2 he has a right to bring a suit here is essentially disregard all of the extraterritoriality principles, disregard foreign policy, try to analogize the moral right and say it's really the same as a derivative right, but all of the authorities from the Berne Convention to Garcia to Friedman to all of the cases that we cite in our brief make it very clear that these labels mean something, and they mean something, notwithstanding their effort to muddy the waters. Let me just ask you something. I'm going to just take you a couple minutes over because I gave them a couple minutes here. But from your perspective, is there anything that, any benefit to publication in this area that was not clearly established when both of you were litigating this matter? I think that for purposes of not opening the floodgates or the potential floodgates of allowing parties who have worldwide distribution agreements to now be faced with any concern with respect to whether or not parties in moral rights countries can try to construe contracts to essentially do the same thing here. I think the pronouncement of the distinction between an economic right and a moral right would serve for clarity in that respect, yes. Obviously, if you win, you think that that would be a good idea. Yes. I think that's the right result, Your Honor, with respect, yes. All right. Did you want to, you can have another minute if there was anything else you would want to add. I think I would just like to actually talk about the Supreme Court case in Norfolk for just one second because that is one of the principal cases that plaintiff relies on for the proposition that you have to read the foreign law into any contract. Interestingly, in that case, it was a case about whether or not in connection with a railroad merger, there was a question as to whether or not the exemption statute for the carriers from antitrust laws and all other laws included a collective bargaining agreement. And the collective bargaining agreement was determined to be the, founded on principles of contract law. So the court eventually said all laws meant that one as well. And to suggest that Norfolk stands for the proposition that you bring immoral rights into the United States because you read in the 2002 agreement to provide a new right and remedy in the United States is not what Norfolk stands for. In fact, it says you have to read the entire, you know, law in and as the law is read in, they don't get to sue for money damages anywhere. Number two, it says you read in also the law of the country where the contracts should be performed. Well, this was under the 2002 agreement worldwide. So not only are you reading in Egyptian law, you're reading in United States law, you can't just say, oh, only Egyptian law and only 143 gets read into the contract as a restriction on the financial right transfer. It just doesn't make any sense. Okay. Thank you for your argument. Thank you very much. I appreciate the court's additional time. I've done my homework. Okay. And Judge Callahan, you asked if our expert agreed that the 2002 agreement transferred all rights away because they cited to say you have to speak up a little bit. Your voice dropped down. My apologies. Transferred what? This was in response to my question where I said the Pelley's brief states that the plaintiff's own expert testified that the plain language of the 2002 agreement allows the defendant to use Kassara in big pimping. So our response is at footnote 10 of the reply brief. That quote was taken out of context. Shortly after that response, it was clarified to say specifically that this agreement did not transfer all of the rights. And our expert said that repeatedly in his trial testimony. So we have one expert saying the agreement says X. We have another expert saying the agreement says Y. And yet the court under Rule 50 takes it away from the jury. That doesn't seem fair. But I think the more fundamental point is... I'm trying to understand what you're saying. Are you saying that the quotation attributed to your expert witness was in error? Yes, it was. What was the quotation and why was it an error? Well, I believe Judge Callahan read a quotation saying that... All rights were transferred. All rights were transferred. That was an error. Why was it an error? What did the expert say and on what page? Okay. ER 728 question. Yeah. So just so the record's clear, based on the plain language of the agreements that you reviewed, do you believe that these agreements that are an issue in this case provide the defendants the right to use COSARA in Big Pimpin? Answer, no. So what was most remarkable to me about Ms. LaPera's argument was her response to Judge Bea. Essentially she was saying, this is no problem. The plaintiff can go back to Egypt to enforce his rights there. He has all the remedies in the world in Egypt. Just go back to an Egyptian court and sue there. Everything will be fine. But then when Judge Bea asked, can he do that? Ms. LaPera said, oh, but there was no infringement there. So they're essentially setting up a catch-22 for foreign authors. Go to your home country and enforce your rights under your own laws, but if there's no infringement there, then you're out of luck. That can't be the message that this court is sending to foreign authors under the Berne Convention, under eTarTas, under the body of case law and under principles of fairness. Why? Why can't the United States courts say, you may have a right in Egypt, and if it's infringed in Egypt, your moral right is infringed. Sue there. If it's not infringed there, that's all that Egypt gives you. Are you saying that Egypt law becomes the law of the Ninth Circuit? Not at all, Your Honor. We are enforcing a right under United States law. We're suing for infringement in this country. The only reason why Egyptian law matters is it dictates the scope of rights that we own. In other words, if we wanted to know who owned a building in North Carolina, we wouldn't look at California law. We'd go back to the situs of the property. That's exactly what we're doing here. We're going back to Egypt and asking, who in Egypt owns the right to make fundamental changes in Kosara? I think Ms. Slapera made it quite clear, that's us. Now we're suing under the U.S. Copyright Act to remedy infringement in the United States. And your position is that using the word all six times in the agreement doesn't really transfer all the rights. Because it doesn't transfer moral rights, because those can't be transferred under Egyptian law. That, and that's the context in which the agreement was written. In other words, when they were negotiating this deal, both parties knew that you just can't transfer those rights where the contract was created. And note, not once in the lengthy history of this litigation has Mr. Jaber appeared and said, oh, I can't believe that Mr. Fahmy is saying I don't own these rights. So we have Mr. Fahmy saying I own rights, and the other party of the agreement just hasn't appeared. And they're trying to exploit that for an unfair advantage and to get away with clear infringement in the United States. Thank you.
judges: Kelly, Callahan, Bea